WILLIAM JESS PILKAY, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pilkay v. Commissioner
Docket No. 23678-88
United States Tax Court
T.C. Memo 1991-143; 1991 Tax Ct. Memo LEXIS 162; 61 T.C.M. (CCH) 2281; T.C.M. (RIA) 91143; April 1, 1991, Filed Decision will be entered under Rule 155. William J. Pilkay, Jr., pro se. Howard P. Levine, for the respondent. PARR, Judge. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined petitioner misappropriated a total of $ 540,244 between 1982 and 1984 and determined deficiencies in and additions to petitioner's individual Federal income tax as follows: Additions to tax
sections
Year Ending
Deficiency
6653(b)(1)
6653(b)(2)
6661
December 31, 1982
$  70,045
$ 35,023
*
$ 17,511
December 31, 1983
137,300
68,650
*
34,325
December 31, 1984
38,229
19,115
*
9,558
Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Before trial respondent redetermined that petitioner misappropriated $ 395,290 (see appendix A) between *163 1982 and 1984 and conceded petitioner is entitled to itemized deductions of $ 34,600 in 1983 and $ 1,300 in 1984, representing repayments of funds misappropriated. The adjusted deficiencies are as follows: Additions to tax
sections
Year Ending
Deficiency
6653(b)(1)
6653(b)(2)
6661
December 31, 1982
$  45,000
$ 22,500
*
$ 11,250
December 31, 1983
104,912
52,456
*
26,228
December 31, 1984
19,964
9,982
*
4,991
Petitioner admits he had possession, custody, and control of $ 367,990 of the amount determined, but denies he had control over $ 27,300 from the Law Enforcement Trust Fund in December 1982. After other concessions by both parties the issues for decision are (1) whether petitioner is collaterally estopped from denying that from 1979 through 1984 he misappropriated funds in excess of $ 20,000 from each of the following: the State of Florida and City of Tampa, the City of Tampa, Law Enforcement Trust Fund, and the *164 Tampa Police Pistol and Rifle Club, Inc.; (2) whether petitioner understated his gross income by $ 99,011, $ 239,428, and $ 56,851 in 1982, 1983, and 1984, respectively; (3) whether these underpayments were due to fraud; (4) whether petitioner is liable for the addition to tax under section 6661 for all years in issue; and (5) whether petitioner is entitled to a $ 1,200 commission expense deduction on his 1983 Schedule C. FINDINGS OF FACT Some of the facts are stipulated and found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein. Petitioner resided in Tampa, Florida, at the time he filed his petition for redetermination with this Court. Background
On November 25, 1963, petitioner was hired by the City of Tampa Police Department. In May 1977 he was promoted to Fiscal Bureau Commander. He remained in this position until October 1984 when he was fired. Petitioner's immediate supervisor, Assistant Chief of Police Don Newberger (Officer Newberger), oversaw the operation of the Fiscal Bureau. As Fiscal Bureau Commander petitioner was responsible for the financial functions of the police department, including payroll, purchase orders, *165 requisitions, accounts payable, accounts receivable, and planning and preparing the budget. The budget was submitted to the mayor and his staff and city council. However, Officer Newberger or Chief Smith were the only individuals with authority to change budgetary items or transfer police funds. Additionally, petitioner was responsible for the maintenance and upkeep of 610 vehicles and 1,200 items of radio equipment. Sometime between 1982 and 1984 petitioner instructed a Lieutenant Mauldin to drive to Miami, Florida, and pick up some electronic equipment from the City of Miami. Petitioner gave Lieutenant Mauldin $ 20,000 in cash to pay the City for the equipment; apparently the City of Miami did not want a check. Law Enforcement Trust Fund
As Fiscal Bureau Commander petitioner had authority over and was usually entrusted with all monies confiscated and turned over to the Tampa Police Department by order of various courts. The confiscated funds were to be deposited into the Tampa Police Department's checking account with the Exchange National Bank of Tampa (Region IX account, 1007241101) and allocated within that account to the "Law Enforcement Trust Fund" (LETF). The *166 confiscated funds were an additional source of revenue for the Tampa Police Department for use in its sole discretion. On May 24, 1982, $ 57,300 in U.S. currency was seized by the Tampa Police Department from drug traffickers. Pursuant to a Florida Circuit Court's order, dated December 15, 1982, the $ 57,300 was forfeited to the City of Tampa Police Department "for the use of Chief Robert L. Smith." On December 28, 1982, $ 30,000 was deposited into the Region IX account (1007241101). The remaining $ 27,300 was neither deposited into the Region IX account, nor any checking account over which petitioner had signatory authority. On March 18, 1983, petitioner was entrusted with $ 25,000 cash from the vice fund. On March 21, 1983, he made three separate deposits into his personal account with Freedom Savings (0400001012); two for $ 8,000 and one for $ 9,000. On that same day he deposited a $ 25,000 check payable to Region IX, into Region IX's account at the Exchange National Bank of Tampa (1007241101). The check was written on his Freedom Savings account (0400001012). On March 23, 1983, petitioner was entrusted with $ 23,220 in U.S. currency from the vice fund. On March 25, 1983, *167 he made four cash deposits into his Freedom Savings account (0400001012); $ 8,720, $ 9,000, $ 4,500, and $ 1,000. Region IX
In addition to his duties as Fiscal Bureau Commander, on August 24, 1979, petitioner was appointed Fiscal Agent for Region IX of the Florida Department of Law Enforcement. The Region IX Training Council gave petitioner authority to sign checks against funds deposited into the Region IX account (1007241101). Petitioner was the only officer authorized to sign checks on this account, until August 20, 1984, when the policy was changed to require two signatories. Petitioner performed his duties as Region IX's fiscal agent until he was fired on October 14, 1984. As Region IX's fiscal agent, petitioner was in charge of disbursing state funds to various training facilities in a four-county area. He also conducted internal audits for participants in the Region IX training program. Petitioner's fee for performing his duties as fiscal agent was five percent of the gross payments. Petitioner was under the direct supervision of the president of Region IX, who was under the direct supervision of the State of Florida. Twice a year the State of Florida received *168 funds and transferred those funds to the Region IX president. The president in turn transferred those funds to petitioner who disbursed checks to the various training facilities according to preapproved budgets. Between May 1979 and October 1984 petitioner had possession, custody, and control of the bank statements and cancelled checks for the Region IX checking account and was responsible for the reconciliation of the bank book. In approximately April 1983, Jane F. Siling (Ms. Siling) was selected to train with petitioner in the fiscal bureau. She trained with petitioner until the Spring of 1984. Ms. Siling shared a small office with petitioner and was aware that petitioner handled most of the day-to-day operations according to established city policy. She was also aware that petitioner did not always handle petty cash disbursements in accordance with policy. For example, he kept large amounts of cash on hand in the office and often cashed employee's personal checks with these funds. He also made loans to various employees with these funds. Ms. Siling also knew that petitioner used some petty cash to pay for police department business. Ms. Siling believed that between April *169 1983 and Spring 1984 petitioner spent between $ 5,000 and $ 10,000 of the petty cash on police business. In or around August 1984, while petitioner was on personal leave, Ms. Siling received the monthly bank statement for the Region IX account. Contained therein was a $ 2,200 check drawn on the account, signed by petitioner, and made payable to Service T, Ltd., one of petitioner's businesses. Ms. Siling immediately brought the discrepancy to the attention of Officer Newberger. Thereafter, an investigation began on the account and petitioner. Petitioner was later confronted by Officer Newberger regarding the disbursement. Petitioner claimed that he put personal funds into the Region IX account to hide them from his wife with whom he was having personal problems, and who was contemplating divorce. Petitioner also claimed that he had written only between $ 25,000 and $ 30,000 in checks out of the Region IX account. Petitioner provided the bureau with only a few records pertaining to the Region IX account during the investigation. The original bank statements and cancelled checks could not be located in petitioner's office. Thus, the bureau was forced to obtain copies of Region *170 IX's statements and checks from the bank. Tampa Police Pistol and Rifle Club
The Tampa Police Pistol and Rifle Club (TPPRC) is a social club incorporated under the laws of the State of Florida. The club allowed law enforcement officers to join the club upon approval and payment of the annual dues. A checking account was maintained for TPPRC at the Exchange National Bank of Tampa (1103006201). The account required two signatures on each check written. During the years in issue, petitioner was president of the TPPRC, maintained TPPRC's checking account at his office in the police department, and executed almost every check written on TPPRC's account. Often petitioner presented a blank check to the other signatory, Deputy Sheriff Updegrove, to execute. Deputy Updegrove never saw or knew the amount the checks were written for, nor to whom they were written. After petitioner left the bureau, Ms. Siling became treasurer and found discrepancies in the club's books and records. There were thousands of dollars worth of checks written by and made payable to petitioner or one of his concerns; approximately $ 37,913 in 1982, $ 24,060 in 1983, and $ 8,340 in 1984. Service *171 T, Ltd.
Between 1982 and 1984 petitioner operated a sole proprietorship accounting and tax return preparation business under the name "Service T, Ltd." (Service T). Petitioner prepared several thousand returns during his life and is familiar with the concepts and requirements of reporting income and deductions. Petitioner maintained a separate bank account for this activity at First Florida Bank (404407050). T Accounting, Inc.
Between November 1983 and December 1984 petitioner was the sole shareholder and officer of a computerized accounting service named "T Accounting, Inc." (T Accounting). He owned 100 shares of stock with a total cost basis of $ 10,000. In December 1984 petitioner disposed of 90 shares reporting a $ 9,000 long-term capital loss, and claiming a $ 3,000 loss on his return. Petitioner maintained a separate account for this activity at Freedom Savings (0405002289). Other Employment
From 1975 through March 1984 petitioner was employed at Interstate United Management Company (IUMC), which ran the food concession for the Tampa Bay Stadium. During 1982 and 1984 he worked in IUMC's security department. Bank accounts
During the years in issue, *172 petitioner had signatory authority over eight separate accounts. [1] He used three of his personal accounts to deposit all monies misappropriated from the City of Tampa and TPPRC. [2] Petitioner expended approximately $ 215,888.61 for personal purposes and wrote approximately $ 35,415.19 worth of checks to the City of Tampa from those accounts during the years in issue. *173 Convictions
The State of Florida determined that between 1979 and 1984 there was $ 538,335.59 [3] total unauthorized disbursements from the Region IX and TPPRC accounts and that petitioner was the individual responsible for making those disbursements. Accordingly, in October and November 1984, petitioner was charged under section 812.014(2)(a) of Fla. Stat. with three counts of grand theft in the first degree for misappropriating [4] in excess of $ 20,000 from TPPRC, LEFT, and Region IX each. *174 On or before April 11, 1986, petitioner entered a plea of guilty to the three crimes. On April 11, 1986, the Circuit Court in and for Hillsborough County, Florida, entered judgments against petitioner and imposed the following agreed lenient sentences: * * * the defendant to be sentenced in the Florida State Prison for a period of one year and one day, serving five years' probation, said probation to be served consecutive to the prison sentence but concurrent to each other. Special condition of probation is that the defendant perform a thousand hours of community service.
After sentencing, the Assistant State Attorney explained the reason for the leniency of the sentences as follows: * * * even though Mr. Pilkay, by our calculations, took a great deal of money from the various accounts of which he had control, we have not to this day been able to ascertain how much of that money was used for his personal benefit. We do know that a great deal of it was used for the benefit of the Tampa Police Department. He would simply cut corners in supplying the police department with supplies and things that it needed, by combining them with money that he had misappropriated *175 from one of these accounts. A great deal of these transactions were in cash. A great many of these were funnelled into his personal account; then back out again. So we have not after all this time calculated the exact number. We know the sum of what was misappropriated. We cannot determine how much of that was used to his personal benefit, but we do know a great deal was not used for his personal benefit. He thought, it appears, that he was doing the best thing for the department by doing things this way.
Tax Returns
Petitioner reported income and deductions for the years in issue as follows: (1) Source of Income
1982
1983
1984
City of Tampa (W-2)
$ 27,510
$ 34,524
$ 28,426 Interstate United
Management (W-2)
384
2,300
n/a  Schedule C
29,895
33,365
11,625 Pension
-0- -0- 7,128 Interest
-0- 306
334 Tax Refund
-0- 12
1,450 $ 57,789
$ 70,507
$ 48,963 Total income reported for the three years
was $ 177,259.
(2)  Use of Income (Cash outlays only)
Withholding and FICA
$  3,922
$  4,973
$  4,034 Pension Contribution
1,926
2,256
1,990 IRA Contribution
2,000
2,000
-0- Schedule A
17,034
25,819
16,687 Schedule C
4,222
12,363
6,253 Cost of Goods Sold
12,600
2,500
305 Fixed Asset Purch.
3,500
-0- -0- $ 45,204
$ 49,911
$  29,269
Cash flow per 1040's
$ 12,585
$ 20,596
$  19,694
*176 OPINION 1. Estoppel
The first issue for decision is whether petitioner is collaterally estopped from denying he misappropriated at least $ 20,000 from the three sources indicated by respondent between September 1, 1979, and October 31, 1984. We find he is. He is not, however, estopped from denying he misappropriated at least $ 20,000 from each source during the years in issue. Petitioner, however, has not denied he misappropriated some funds and, as explained below, we find he misappropriated funds from the three sources during the years in issue. 2. Deficiency
The next issue for decision is whether petitioner failed to report income as determined by respondent. Petitioner bears the burden of proof. [5]Rule 142(a). Petitioner contends that approximately $ 210,000 of the amount respondent determined was used *177 for the benefit of the police department and, therefore, should not be income to him. In support thereof, petitioner states that during his criminal trial he gave his attorney (Dan Perry) an 8 or 9-page list of items he purchased for the Tampa Police Department between 1979 and 1984 with cash, totaling approximately $ 175,000. [6] He also stated that he spent an additional $ 24,000 cash ($ 8,000 per shipment) during this period for bulk shipments of ammunition, and another $ 10,000 for parties given by the police department. Respondent alleges that petitioner misappropriated to his own use approximately $ 395,290. In support thereof, joint exhibits, including police accounting reports, bank records, and portions of petitioner's criminal convictions, were introduced into evidence. For the following reasons, we find petitioner misappropriated $ 241,286, rather than $ 395,290. On brief, respondent stated *178 that the State of Florida included in its misappropriation amounts, transfers to funds between accounts and unauthorized disbursements, and that the IRS reduced those amounts by checks written to the TPPRC, checks deposited to the City of Tampa, payroll checks, and checks to Region IX for which petitioner did not receive an economic benefit. However, Theodore P. Hammer (Sergeant Hammer) of the Tampa Police Department testified that the department determined petitioner misappropriated approximately $ 410,000 of the total unauthorized disbursements between 1979 and 1984. [7] He also stated that the $ 410,000 represented the total funds that were deposited into petitioner's checking accounts from these various sources, i.e., the net amount that the State was missing. *179 Because the State of Florida determined petitioner misappropriated $ 410,000 in six years, we find it impossible to believe that petitioner misappropriated either $ 540,244 or $ 395,290 during the three years in issue. Accordingly, after reviewing the State of Florida's calculations we find the maximum amount petitioner could have misappropriated during 1982, 1983, and 1984 is $ 260,795.91. See appendix B. As further support of our finding, we note that on brief respondent stated: * * * After concessions, the respondent determined that the petitioner appropriated $ 99,011.00, $ 239,429.00 and $ 56,851.00 during 1982, 1983 and 1984; of these amounts, 53 percent, 62 percent and 71 percent has been corroborated from an analysis of specific disbursements from accounts that the petitioner had custody and control over as being expended for his personal benefit.
Thus, respondent in effect concedes that petitioner benefited from only $ 241,286 of the $ 395,291 alleged to have been misappropriated: $ 52,476 in 1982, $ 148,446 in 1983, and $ 40,364 in 1984. We have independently traced and analyzed the alleged misappropriated funds and arrived at a figure extremely close *180 to respondent's $ 241,286. Accordingly, we accept respondent's analysis and find petitioner misappropriated $ 52,476 in 1982, $ 148,446 in 1983, and $ 40,364 in 1984. 3. Commission expense
We must next decide whether petitioner is entitled to a $ 1,200 commission expenses deduction on his 1983 Schedule C. Petitioner did not present any evidence on this issue. Accordingly, we find in favor of respondent. Additions to tax
4. Fraud
The next issue for decision is whether petitioner is liable for the additions to tax for fraud. Respondent determined that petitioner is liable for additions to tax under section 6653(b)(1) and (2) for fraudulently understating his income for each of the years in issue. Section 6653(b)(1) provides for an addition to tax equal to 50 percent of the underpayment of the tax required to be shown on a return, if any part of the underpayment is due to fraud. Section 6653(b)(2) provides an additional amount equal to 50 percent of the interest on the portion of the underpayment attributable to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Stone v. Commissioner, 56 T.C. 213, 220 (1971). *181 This burden may be met by showing (1) that an underpayment exists, and (2) that petitioner intended to evade taxes which he knew to be owing, by actions intended to conceal, mislead, or otherwise prevent the collection of taxes. Mitchell v. Commissioner, 118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); Parks v. Commissioner, 94 T.C. 654 (1990); Rowlee v. Commissioner80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact that must be resolved upon a consideration of the entire record. Rowlee v. Commissioner, supra at 1123; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed, Beaver v. Commissioner, 55 T.C. 85, 92 (1970), but may be proved by circumstantial evidence, because direct proof of the taxpayer's intent is rarely available. Rowlee v. Commissioner, supra at 1111; Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); *182 Gajewski v. Commissioner, 67 T.C. at 200. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. at 223-224; Petzoldt v. Commissioner, 92 T.C. 661, 669 (1989). The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. Holland v. United States, 348 U.S. 121, 137, 99 L. Ed. 150, 75 S. Ct. 127 (1954); Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court. [8]
Other badges of fraud include: maintaining inadequate records; failing to cooperate with tax authorities; dealing *183 in cash; and concealing assets. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. [9]
Petitioner failed to keep adequate business and personal records. He dealt largely in cash transactions and made numerous cash deposits into his personal checking accounts. Most cash deposits made into his personal accounts were less than $ 10,000. Accordingly, the financial institutions were not required to file a currency transaction report.
During 1982, 1983, and 1984, petitioner misappropriated $ 241,286 from his employer. He lied to his supervisor when he stated he had written $ 25,000 to $ 30,000 worth of checks out of Region IX, when in fact he had written approximately $ 120,000 during the years in issue. He also coerced at least one employee to lie about a $ 3,000 loan he made to her with some of the funds he misappropriated. *184 He was also a tax-return preparer and was knowledgeable on tax matters, i.e., that misappropriated income is taxable. He did not, however, report any of the misappropriated funds on his returns. Although one of petitioner's intentions in failing to report the misappropriated income was to hide his activity from his employer, he nevertheless intentionally and deliberately failed to report it. Thus, we infer from that action that petitioner intended to evade tax on those funds. See McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967, 47 L. Ed. 2d 734, 96 S. Ct. 1463 (1976) (it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax.) Based on the foregoing, we conclude petitioner intended to conceal, mislead, and prevent the collection of taxes he knew to be owing. Thus, petitioner is liable for the addition under section 6653(b)(1) for each of the years in issue. Additionally, as to section 6653(b)(2), we conclude *185 that only the underpayments attributable to the misappropriated funds are attributable to fraud. 5. Substantial understatement of liability
The final issue for decision is whether petitioner is liable for the addition to tax under section 6661(a) for substantially understating his income tax for the years in issue. Respondent determined that there was a substantial understatement of income tax for all years in issue, and that petitioner was liable for a 25-percent addition to tax. [10]
An understatement of tax is the excess of the amount of tax required to be shown on the return over the amount of tax shown on the return. Sec. 6661(b)(2)(A). An understatement is substantial if it exceeds the greater of $ 5,000, or 10 percent of the amount required to be shown on the *186 return. Sec. 6661(b)(1)(A). Petitioner neither offered "substantial authority" for his understatement, nor did he "adequately disclose" any facts affecting the tax treatment of the items in issue as provided by section 6661(b)(2)(B)(i) and (ii). Accordingly, petitioner substantially understated his income tax and is liable for the section 6661(a) addition at the 25-percent rate. To reflect the foregoing,
Decision will be entered under Rule 155.
APPENDIX A
From Tampa Police Department Region IX Trust Fund
Account no. 1007241101
Exchange Bank
1982
1983
1984
TOTAL
Checks to Pilkay
$ 15,216
$ 69,260
$ 36,000
=
$ 120,476
Checks to Services T
-0- 16,000
2,272
=
18,272
Checks to T Accounting
-0- 9,000
-0- =
9,000
Checks to City of Tampa
(Cash)
-0- 18,402
-0- =
18,402
Law Enforcement
Trust Fund
27,300
48,220
-0- =
75,520
SUBTOTAL:
$ 42,516
$ 160,882
$ 38,272
= $ 241,670
From Tampa Police Pistol and Rifle Club, Inc.
Account no. 1103006201
Exchange Bank
1982
1983
1984
TOTAL
Checks to CASH
$  3,699
$   7,188
$  2,627
=
$   13,514
Checks to City of Tampa
(Cash)
14,883
47,298
7,612
=
69,793
Checks to Pilkay, et al
37,913
* 24,060
8,340
=
70,313
SUBTOTAL:
$ 56,495
$  78,546
$ 18,579
=
$ 153,620
TOTALS:
$ 99,011
$ 239,428
$ 56,851
=
$ 395,290
*187 Respondent reduced the misappropriated amount from $ 540,244 to $ 395,290 after the Court discovered and discussed with the parties an unsigned, undated statutory notice of deficiency and an Appeals Transmittal Memorandum and Supporting Statement attached to respondent's "Answer To Amended Petition." The unsigned, undated notice and transmittal supported an initial determination that petitioner's income should be increased by a total of $ 448,430 for 1982, 1983, and 1984. Page 3 of the transmittal supporting that $ 448,430 increase provides in relevant part as follows: The taxpayer was indicted and plead guilty to 3 counts of embezzlement. He was charged with embezzling in excess of $ 31,640.00 from the Law Enforcement Trust Fund, in excess of $ 48,220.00 from the Tampa Police Pistol and Rifle Club and $ 95,926.31 from the Regional IX Training Fund.
Additionally, page 4 of the transmittal provides in relevant part as follows: In the instant case, it appears, as concluded *188 by the State Attorney, that the taxpayer did not use all of the funds for his personal use. However, the taxpayer is in a position that he cannot prove how much of the funds were used personally and how much was used for the benefit of the Tampa Police Department. Therefore, it is recommended that the * * * District's position be sustained.
The deficiency notice actually sent to petitioner, increased his income to $ 540,244 for the three years.
APPENDIX B We calculated the $ 260,795.91 figure using all evidence available to us as follows: First we reduced the States Region IX net figure of $ 140,132.98 by those amounts attributable to years before 1982. Thus, $ 2,100 and $ 15,000 was subtracted from $ 140,132.98 to arrive at $ 123,032.98. Next, we added the amount we redetermined petitioner misappropriated from the TPPRC account, i.e., $ 137,762.93, as calculated below, to the $ 123,032.98, or $ 123,033 rounded. Thus, we arrived at $ 260,795.91 as the maximum amount petitioner could have misappropriated during the three years in issue. The $ 137,762.93 was calculated as follows: First, we took into consideration the amount the Tampa police department determined to be *189 the total unauthorized disbursements from the Region IX fund ($ 140,132.98) and the TPPRC fund ($ 398,202.61) between 1979 and 1984. At trial a police officer testified that the Tampa Police Department determined that petitioner misappropriated a net total of $ 410,000 between 1979 and 1984 from both accounts. Thus, $ 128,335.59 was determined by the police department to have been used for police purposes ($ 538,335.59 minus $ 410,000) during the six years. If we subtract the $ 140,132.98 Region IX amount from $ 410,000 TPPRC amount, we arrive at $ 269,867.22 as the net total embezzled funds from the TPPRC between 1979 and 1984. We now redetermine the amount petitioner misappropriated from these accounts for taxable years 1982 through 1984. The evidence presented does not break down the amounts embezzled from Region IX into specific years. Accordingly, we are not able to determine the portion of those funds used for police purposes. However, the TPPRC account was broken down into years. Thus, we looked to that account to determine the percentage of the $ 128,335.09 attributable to each year. Respondent conceded that the payroll checks were not properly taxable to petitioner. *190 Accordingly, we reduce the $ 128,335.09 amount by the $ 85,563.58 total payroll checks for 1979 through 1984. This leaves $ 42,772.01 to be allocated between 1979 and 1984. To best determine the percentage of the amount spent for police purposes each year, we take the ratio between the total unauthorized disbursements for each year and the total unauthorized disbursements for all years and multiply that ratio by $ 42,772.01. The following figures represent the portion of the $ 42,772.01 estimated as spent each year for police purposes: 1979
-
$  8,970.93
1980
-
$  5,052.51
1981
-
$  4,890.20
1982
-
$  7,988.32
1983
-
$ 12,773.92
1984
-
$  3,096.22
$ 42,772.10
Because taxable years 1982 through 1984 are before us, we next determine the net total misappropriated funds for those years by subtracting from each year the total indicated above. The result is as follows: 1982
-
$  48,507.47
1983
-
73,772.48
1984
-
15,482.98
$ 137,762.93
-
total misappropriated funds by petitioner
from TPPRC for the taxable years in issue.
Footnotes
*. 50 percent of the interest due on the entire deficiency.↩
*. 50 percent of the interest due on the entire deficiency.↩
1. Tampa Police Pistol &
Rifle Club, Inc.
Exchange Bank
1103006201
Tampa Police Department
Region IX Trust Fund
Exchange Bank
1007241101
Services T. Ltd.
First Florida
404407050
T Accounting
Services, Inc.
Freedom Savings
0405002289
William J. Pilkay, Jr.
Freedom Savings
0400001012
William J. Pilkay, Jr.
Exchange Bank
10030916040/
2749998
William J. Pilkay, Jr. $ 32,060 minus $ 8,000.
*
Tampa Federal
Credit Union
36186
Shirley or William
Pilkay *
Exchange Bank
1739151200
* The parties agree that none of the misappropriated funds were deposited into these accounts.↩
2. ↩
1982
1983
1984
Freedom Savings
Personal expenditures
$    -0-   $  48,014.63 $ 44,496.59
City of Tampa
859.28 16,766.04 3,448.50
Exchange Bank
Personal expenditures
$ 46,333.47
$  34,875.77 $  3,207.05
City of Tampa
9,957.66
763.00 880.00
First Florida (Service T. Ltd.)
Personal expenditures
$  3,600.00
$   28,954.10
$  6,407.00
City of Tampa
1,562.00
1,178.71
-0- TOTAL
Personal expenditures
$ 49,933.47
$  111,844.50
$ 54,110.64
City of Tampa
$ 12,378.94
$   18,707.75
$  4,328.50
3. The $ 538,335.59 includes $ 140,132.98 from the Region IX (this includes the LETF) and $ 398,202.61 from TPPRC.↩
4. The Informations for grand theft in the first degree state in relevant part the following: * * * CHARGES that WILLIAM J. PILKAY, JR. from September 1, 1979 through October 31, 1984 * * * did knowingly and unlawfully obtain or use, or endeavor to obtain or use certain property of another, * * * the value of said property being twenty thousand dollars ($ 20,000) or more in money current in the United States of America; and in so doing intended either to permanently deprive * * * of a right to the property or a benefit therefrom, or to appropriate the property to his own use or to the use of any person not entitled thereto, * * *↩
5. Under Rule 142(a), Tax Court Rules of Practice and Procedure↩, the burden of proof and of going forward with the evidence in this case on all issues, except fraud, is on petitioner.
6. Included in the $ 175,000 is the $ 20,000 cash used to purchase the electronic equipment from the City of Miami.↩
7. In or around 1984 the State of Florida initially determined the maximum amount of unauthorized disbursements petitioner made between 1979 and 1984 was $ 538,335.59. It also determined that most of those funds were used for the benefit of the Tampa Police Department. Respondent initially determined petitioner misappropriated $ 540,244 between 1982 and 1984.↩
8. Merritt v. Commissioner, T.C. Memo 1959-172, affd. 301 F.2d 484↩ (5th Cir. 1962).
9. Bradford v. Commissioner, T.C. Memo 1984-601, affd. 796 F.2d 303↩ (9th Cir. 1986).
10. The rate under section 6661(a) was increased from 10 to 25 percent by section 8002(a) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, effective for additions to tax assessed after October 21, 1986.↩